UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLISON PRESCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil No. 15-CV-13433-LTS |
| | ) |
| CAROLYN W. COLVIN | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER ON CROSS-MOTIONS REGARDING DENIAL OF
SOCIAL SECURITY BENEFITS

January 27, 2017

SOROKIN, J.

Allison Prescott brought this action pursuant to section 205(g) of the Social Security Act,
42 U.S.C. §§ 405(g)(3), challenging the final decision of the Commissioner of the Social
Security Administration ("Commissioner") denying her claim for Social Security Disability
Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. The matter is
presently before this Court on the Prescott's Motion to Reverse, Doc. No. 16, and the
Defendant's Motion to Affirm the Commissioner's Decision, Doc. No. 22.

At issue is whether the Administrative Law Judge ("ALJ") erred in rendering his
assessment of Prescott's residual functional capacity ("RFC") by improperly weighing the
opinions of the medical professionals and whether the ALJ committed reversible error by relying
on the testimony of a vocational expert whose opinion was, according to Prescott, based upon an
improperly formulated RFC, while ignoring a contrary opinion from a second vocational expert.

1

For the reasons detailed below, this Court DENIES Prescott's Motion to Reverse, Doc. No. 16, and ALLOWS the Defendant's Motion to Affirm, Doc. No. 22. .

## PROCEDURAL HISTORY

Allison Prescott, who is currently 45 years old (born October 8, 1970), submitted applications for a period of disability and disability insurance benefits (Title II), as well supplemental security income (Title XVI) on July 20, 2012. R. at 165–66.[1] Ms. Prescott's claims were denied initially on December 13, 2012, and upon reconsideration on April 2, 2013. R. at 14. Following her timely written request, a hearing was held before ALJ Sean Teehan on January 28, 2014. R. at 37–114. A supplemental hearing was held on April 30, 2014.

On May 30, 2014, the ALJ issued a decision denying Prescott's claims. R. at 14–30. On July 27, 2015, the Appeals Council denied Prescott's request for further review. R. at 1–6. Prescott has exhausted her administrative remedies and now seeks judicial review by this Court pursuant to 42 U.S.C. § 405(g).

## FACTUAL HISTORY

Prescott was 37 years old on her alleged onset date. R. at 294. Prescott alleged disability due to diabetes, back injury, dysrhythmia, post-traumatic stress disorder ("PTSD"), anxiety disorder, arthritis, depression, asthma, polycystic ovarian syndrome, and migraines. R. at 342. Prescott had past relevant employment as a photo lab supervisor at CVS Pharmacy. R. at 350. Since as early as 2008, and at all relevant times, Prescott was seen by her treating physician, Dr. Margaret-Mary Williams, for issues related to Type II diabetes and conditions related to her diabetes, including neuropathy in the upper and lower limbs. She was also seen for complaints

---

[1] The administrative record can be found at Doc. No. 14 on the courts electronic filing system. The page numbers appear on the lower right-hand side of the administrative record. It is cited herein as "R. at __."

relating to asthma, back pain, blurred vision, migraines, joint pain, trouble walking, and numbness in her hands and feet.

Prescott testified that on a typical day, she rises at 9:30 am and has coffee and cereal and then usually plays on the computer, checks her email, watches television, putters around the house, and makes her bed. R. at 66–67. She stated that she goes to church services and bible study once per week. R. at 68. She also goes to the grocery store once or twice per week, cooks dinner for her family and does the dishes afterwards, and washes her own laundry. R. at 72. She testified that she keeps the kitchen clean and vacuums on the weekends. R. at 73.

A. Medical Evidence

The medical evidence is set forth in the Commissioner's memorandum, Doc. No. 23, the recitation of which Prescott does not dispute.

On June 11, 2008, Prescott visited Dr. Williams for blood pressure and diabetes care. R. at 500. A general examination was normal. R. at 501. The doctor characterized Prescott's diabetes as "uncontrolled" and recommended diet, exercise, and weight loss. Id. Prescott's blood pressure and cholesterol labs were acceptable and her asthma was stable. R. 502.

On October 8, 2008, Prescott visited Dr. Williams for a check of blood pressure and diabetes. R. at 494. She told the doctor that she was doing okay and was looking for work. Id. Her general exam was normal and her diabetes continued to be uncontrolled. Id. Her cholesterol and blood pressure levels were acceptable. R. at 496.

On January 1, 2009, Prescott visited Dr. Williams; her diabetes remained uncontrolled, and the doctor stressed the importance of trying to get back on a better diet. R. at 492. On May 19, 2009, Prescott visited Dr. Williams for a blood pressure and diabetes check. R. at 488. She stated that she was still looking for a job and recently had two interviews for

administrative positions. Id. A general exam was normal. R. at 489. The doctor added a new diabetes medication and increased medication for blood pressure. Id.

On November 23, 2009, Prescott visited Dr. Williams for treatment of diabetes. R. at 486–87. Prescott's asthma was clinically stable and her general exam was normal. Id.

On March 6, 2010, Dr. Williams noted that Prescott's diabetes was not under good control. R. at 483. She encouraged Prescott to work on diet, exercise, and weight loss. Id. On June 16, 2010, Prescott visited Dr. Williams, who noted a normal general exam. R. at 480. The doctor increased Prescott's dose of diabetes medication and encouraged Prescott to get back on track with diet and exercise. Id.

On September 2, 2010, Prescott visited Dr. Williams and stated that her ongoing back problems were the main source of her disability. R. at 476. She also reported weakness and numbness of the hands. Id. Upon examination, her back was normal and straight, with some tenderness to palpation. R. at 477. She had a slightly decreased range of motion of the spine, with mild pain. Id. The doctor told Prescott to consider physical therapy. R. at 478.

On September 30, 2010, Prescott underwent EMG testing with Dr. Ackil. R. at 644–45. The doctor found evidence of moderate motor sensory neuropathy in the upper and lower limbs, mild bilateral radiculopathy, and mild carpal tunnel syndrome. R. at 645.

On October 27, 2010, Prescott visited Dr. Williams for a routine medical exam. R. at 472–74. Her spine was normal with no tenderness, she had no swelling in the extremities, her hands and feet were normal, she had 5/5 strength in all extremities, and her gait was normal. R. at 474. An EMG revealed upper and lower neuropathy, and Prescott started on Gabapentin. Id.

On December 3, 2010, Prescott visited Dr. Williams and stated that her leg pain had lessened since starting Gabapentin. R. at 469. She had no swelling in the extremities and her gait

was normal. R. at 470. Dr. Williams expressed concerns about Prescott's weight and said that if her diabetes did not come under better control, she would need a specialist. R. at 471.

On March 7, 2011, Prescott visited Dr. Williams and complained of sharp chest pain and heartburn. R. at 466. Dr. Williams increased her diabetes medications and discussed seeing an endocrinologist for more in-depth care. R. at 468. Dr. Williams diagnosed hyperlipidemia and indicated that if Prescott continued to gain weight, she may need a second cholesterol medication. Id.

On April 5, 2011, Prescott visited Dr. Howard Fogel at the Diabetes Center of New England for an initial evaluation. R. at 426–27. She complained of occasional blurred vision, but Dr. Fogel noted that she was negative for retinopathy upon exam. R. at 426. He indicated that she was positive for symptoms of neuropathy, with complaints of numbness in the feet, although she displayed intact pulses, sensation, and motor function in both feet. Id. Her glucose panel and liver studies were normal. Id. Dr. Fogel recommended appropriate meal plans, exercise, weight loss, and a change in medication. Id.

On June 16, 2011, an x-ray of Prescott's spine revealed questionable spinal stenosis at L4/L5, mild-to-moderate degenerative disc disease (more prominent than prior study), and no acute bony findings. R. 7at 01.

On December 20, 2011, Prescott visited Dr. Williams and complained of joint pain in the right knee, hip, and hands. R. at 457. She had no edema, redness, or swelling of the extremities and displayed a good range of motion and a normal gait. Id. As to diabetes, the doctor urged her to work harder on diet and weight loss efforts; as to joint pain, the doctor recommended Tylenol, rest, and heat. R. at 459.

On June 20, 2011, Prescott visited Dr. Williams and complained of acute pain in the lower rib cage. R. at 463. Upon exam, Prescott had tenderness over the ribcage. no swelling in the extremities. and a normal gait. R. at 464. The doctor characterized Prescott's diabetes as "uncontrolled" and emphasized the importance of taking her medications, checking blood sugar frequently, and working on diet and exercise. R. at 465.

On March 5, 2012, Prescott visited Dr. Williams for ongoing back and musculoskeletal issues. R. at 453. She also complained of joint pain in her hands and fingers, knee pain, trouble walking, numbness in the hands and feet, and headaches related to stress. R. at 453. Upon exam, Prescott had no actively or acutely inflamed joints. Id. The doctor noted that Prescott's diabetes did not seem well controlled and emphasized the importance of getting on track with diet and weight loss. Id.

On August 31, 2012, Prescott visited Dr. Fogel for diabetes care, complaining of numbness in her feet. R. at 668. The doctor described her diabetes control as "fair" Id.

On October 25, 2012, Prescott visited Dr. Williams to have disability forms filled out. R. at 726. She complained of chronic back pain; numbness in her legs; the inability to lift; chronic numbness in the hands and feet; and problems balancing. Id. Upon examination, her gait was within normal limits, but slowed due to complaints of pain. R. at 728. Dr. Williams noted that diabetic neuropathy was likely starting to affect her gait. Id. Her back was normal, with no spinal tenderness, although she displayed tenderness to palpitation over the paraspinous muscle groups and decreased range of motion of the spine due to pain. Id. A neurological exam was normal. Id. Dr. Williams noted that Prescott's ongoing back pain was consistent with muscular strain/spasm and a history of underlying degenerative disc disease. Id.

On October 30, 2012, Prescott visited Dr. Yacov Kogan, with the Massachusetts Disability Determination Services ("DDS)." R. at 541. She reported chronic lower back pain and numbness in her feet. Id. She reported daily head pain and episodes of left chest pain. R. at 542. An exam revealed no clubbing, cyanosis, or edema in the extremities and no problems with the lumbar or cervical spines. R. at 543. Her motor strength and gait were normal, as were her fine finger movements. Id.

On October 30, 2012, an x-ray of Prescott's lumbar spine revealed degenerative disc disease with little progression since the June 2011 exam. R. at 539.

On November 20, 2012, Prescott underwent a consultative examination with Dr. Byron Garcia. R. at 547–49. Upon exam, she was cooperative, alert, and oriented. R. at 548. She had fair memory and attention and limited judgment and insight. Id. Dr. Garica assessed her with moderate major depressive disorder and opined that with medication and therapy her prognosis was fair. R. at 548–49.

On December 12, 2012, Prescott visited Dr. Williams, and complained of ongoing musculoskeletal pain. R. at 722. Prescott displayed no swelling in the extremities and a normal gait. R. at 724. Her diabetes remained "uncontrolled." Id.

On December 21, 2012, Prescott visited Dr. Fogel for treatment of diabetes. R. at 660. She displayed intact pulses in the lower extremities, intact motor strength, and mild-to-moderately decreased sensation to light touch in her feet. Id. Dr. Fogel stated that Prescott was in poor glycemic control, with weight gain contributing to higher blood sugars. Id. Dr. Fogel increased her insulin doses and emphasized weight loss; Prescott declined to meet with a dietician. Id.

On January 14, 2013, visited Dr. Williams complaining of left neck and shoulder pain. R. at 718. An x-ray of Prescott's spine revealed no acute bony pathology, questionable spinal stenosis at L4/L5, and mild-to-moderate degenerative disc disease (unchanged from prior study. R. at 693–95. Dr. Williams recommended Tylenol with Codeine, rest, heat, and decreased lifting. R. at 720.

On April 24, 2013, Prescott visited nurse practitioner Christine Ordway for diabetes care. R. at 653. Nurse Ordway noted neuropathy complications but no findings on an eye exam. Id. She described Prescott's diabetes control as "fair" Id.

On March 21, 2013, Prescott visited Dr. Fogel and complained of pain in her feet and toes. R. at 655. He described her diabetes control as fair-poor, and recommended no change in medication. Id.

On May 23, 2013, Prescott visited Dr. Williams for a comprehensive exam. R. at 710–14. A general exam revealed normal findings, with no swelling or cyanosis in the extremities, normal range of motion in the extremities, 5/5 motor strength, a normal gait, and a non-tender spine. R. at 713. Dr. Williams described Prescott as clinically stable, noting that recent routine blood testing was within normal limits. R. at 714.

On September 27, 2013, Prescott visited Dr. Williams and complained of falling and swollen feet. R. at 757. Upon examination, she had a normal gait and no swelling in the extremities. R. at 759.

On January 15, 2014, Prescott visited Dr. Williams and reported that she had started going to a gym with her sister to walk on the treadmill. R. at 889. She stated that her vision was not great and that her hands were numb most of the time. Id. Upon exam, Dr. Williams noted trace edema in the lower extremities, with a normal gait. R. at 891. Due to the edema, Dr.

Williams offered the option of updated EMG testing, but Prescott was not interested. <u>Id.</u> Dr. Williams offered to help Prescott find a new provider for compression stockings, but Prescott was not interested. R. at 892.

On March 3, 2014, Prescott visited Dr. Williams, asking to have paper work filled out for her lawyer R. at 885. She stated that she had increased back pain with prolonged walking, standing, or sitting and was suffering from neuropathy in the upper and lower extremities that made some activities difficult. <u>Id.</u> Prescott stated that she now got headaches "often." <u>Id.</u> Prescott informed Dr. Williams that she had "been told" not to raise her arms above her head because of back issues. <u>Id.</u> Upon exam, Dr. Williams noted that Prescott was uncomfortable due to complaints of pain. R. at 887. Prescott had trace edema in both lower extremities, though her gait was within normal limits. <u>Id.</u> The doctor recommended increasing her dose of Gabapentin for pain and continuing with rest and activities as tolerated. <u>Id.</u> As to headaches, Dr. Williams recommended over-the-counter pain medication. <u>Id</u>

B. <u>Opinions Relating to Prescott's RFC</u>

The ALJ considered the following opinion evidence with respect to Prescott's RFC:

Karen Kronenberg LICSW, who first met Prescott on June 29, 2012, opined that Prescott has difficulty concentrating and functioning outside the family home and she is easily distracted with "extreme difficulty staying focused and concentrating on normal daily activities such as reading, talking to people." R. at 560. Kronenberg also completed the SSA's form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." There she indicated a marked limitation in the areas of: ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration sufficient to perform

work tasks throughout an eight hour work day, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to travel in unfamiliar places or use public transportation. The ALJ gave Kronenberg's assessments "little weight" because according to the ALJ, "a good portion of the first two" assessments were "phrased as if the questions were being answered directly by the claimant . . . . Thus it appears that Ms. Kronenberg did not base her assessment in this case on her own clinical observations of the claimant, but rather on the claimant's own words and self-reported abilities/limitations." R. at 26. Further, the ALJ stated that Ms. Kronenberg is "not considered an acceptable medical source within the meaning of the regulations." Id. In addition, the ALJ gave little weight Kronenberg's opinion because the department's form provides "very little room for elaboration, and there is almost no room to deviate from the terms of the form." Id. Finally, the ALJ determined that Kronenberg's opinion was "inconsistent with the record as a whole, including the claimant's conservative, effective treatment history, reported activities of daily living, and baseline GAF scores in the range of 55-58." Id.

Dr. Fogel, a treating physician who in 2012 opined that Prescott's diabetes "does not present any significant functional limitation to normal daily life and work activities." R. at 554. The ALJ gave Dr. Fogel's opinion "some weight," but found that the "record contained sufficient evidence of limitations stemming from [Prescott's diabetes] to satisfy the de-minimis standard of Step Two 'severity,'" and that to the extent that "Dr. Fogel's assessment would support a finding that Prescott's neuropathy is non-severe," the ALJ gave it less weight. R. at 26.

The Department of Transitional Assistance, who found Prescott "disabled" for purposes of EAEDC benefits. The ALJ gave this opinion "minimal weight" stating that a decision made by another agency regarding whether an individual is disabled is not binding, and the DTA conclusion was "inconsistent with the record as a whole, including the claimant's conservative, effective treatment history, reported activities of daily living, and history of noncompliance." R. at 27.

Dr. Williams, Prescott's treating physician for over fifteen years and who had seen Prescott several times a year, completed an RFC questionnaire regarding Prescott wherein she indicated that Prescott's pain or other symptoms would frequently interfere with her ability to concentrate but that she was "capable of low stress jobs." R. at 897. According to Dr. Williams, Prescott could not walk a city block without rest or severe pain. Id. Prescott could sit for about four hours in a workday and stand/walk for four hours. Id. She opined that Prescott must walk every 90 minutes for 10 minutes and would need one 10-minute break per day in which to sit down. R. at 897–98. She opined further that Prescott's legs should be elevated six to twelve inches for the entire work day. R. at 898. As to lifting, Dr. Williams opined that Prescott could rarely lift 20 pounds, occasionally lift 10 pounds, and frequently lift less than 10 pounds. Id. Dr. Williams indicted that Prescott had no significant limitations with reaching, handling or fingering, but then went on to explain in response to the directive "[i]f yes, please indicate the percentage of time during an 8-hour working day your patient can use hands/fingers/arms for the following activities," that Prescott could only use her hands to grasp, turn, twist objects 50% of the time, and could only use her fingers for fine manipulations 50% of the time, and could never use her arms to reach, including reaching overhead. Id.  In addition, Dr. Williams opined that Prescott would be absent from work about one day per month as a result of her impairments.  R.

at 899. The ALJ gave Dr. Williams' opinion "minimal weight," rather than "controlling weight" for the reason it was "inconsistent with other substantial evidence in the case record . . . [was] inconsistent with the record as a whole, including the claimant's conservative, effective treatment history, reported activities of daily living, history of noncompliance, and history of receiving unemployment benefits." R. at 27.

Brenda Ferretti, Prescott's sister who testified that Prescott experiences disabling and mental impairments. The ALJ gave Ms. Ferretti opinion minimal weight. Id. Prescott does not challenge the weight given to Ms. Ferretti's opinion.

Dr. Coka, the State agency medical consultant, opined that Prescott could lift and carry 20 pounds occasionally and 10 pound frequently, to stand and/or walk for 6 hours in an 8-hour workday, and to sit for about 6 hours in an 8-hour workday. The ALJ gave Dr. Coka's opinion "great weight," stating that the opinion was "generally consistent with the record as a whole." R. at 27–28. The ALJ also "accounted for a somewhat greater degree of limitation than assessed by Coka," because the "additional limitations" were "warranted by the record as a whole." R. at 28.

Sue Conley Ph.D, the State agency psychological consultant, opined that the medical evidence established that Prescott could understand and remember simple instructions, carry out simple tasks for two-hour periods over an eight-hour workday and forty-hour work week, manage appropriate superficial interpersonal interactions, and cope with minor changes in her work setting. Id. The ALJ gave Ms. Conley's opinion "great weight" because it was "generally consistent with the record as a whole." Id.

C.  Vocational Expert Testimony

At the hearing, Michael Loria, a vocational expert ("VE") was examined telephonically by the ALJ.  The ALJ asked the VE to assume a hypothetical individual with Prescott's age,

education, and work experience with the following limitations: lift and carry 20 pounds

occasionally and 10 pounds frequently; sit for six hours of an eight-hour workday; stand or walk

for four hours out of an eight-hour work day; occasionally climb stairs and ramps; never climb

ladders, ropes, or scaffolds; occasionally balance, stoop, crouch, kneel, and crawl; avoid

concentrated exposure to unprotected heights and humidity; avoid moderate exposure to

pulmonary irritants; only superficial interactions with supervisors and coworkers; no tandem

work; no direct contact with the general public; perform only three-to-four step tasks for two-

hour increments; and deal with only minor changes in the workplace. R. at 96.

Loria testified that such a person could perform the representative jobs of: (1) assembler,

Dictionary of Occupational Titles (DOT) code 734.687-018; (2) quality control worker, DOT

code 726.684-110; and (3) press machine tender, DOT code 689.585-018. R. at 96–97. He

further testified as to the number to which these specific jobs are available in the local and/or

national economy. R. at 97. Based upon Loria's testimony, the ALJ determined that work exits in

significant numbers in the national economy such that Prescott could not be found "disabled." R.

at 29–30.

On or around April 23, 2014, Prescott submitted an affidavit from another vocational

expert, David Meuse. According to his affidavit, Meuse has a Master of Science degree in

counseling with a specialty in psychosocial rehabilitation, has worked in the field over twenty

years and has been called upon as a vocational expert. R. at 414. Meuse opined that a limitation

of standing no more than 4 hours a day would "generally preclude light work, including the jobs

of assembler, small products . . . , packer (bagger) . . . , and crown assembly machine operator."

R. at 415. He further opined that looking at these jobs, even as representative of a larger group, it

is impossible to know how many jobs are available "because in each of these groups of jobs,

whether viewed by detailed occupation grouping or by census grouping, there are multiple jobs, some of which would exceed the limitation to only four hours of standing and some of which would exceed the limitation to unskilled work (because they are rated as semiskilled or skilled, not unskilled work)." Id.  Meuse also opined that the each specific job Loria suggested was available in the local or national economy, "no longer exists in any significant numbers in the United States." R. at 416. Finally, Meuse opined:

> Furthermore, I would be remiss as a vocational expert in not noting: (a) that from my experience jobs such as these which are performed in a factory setting ordinarily involve exposure to dust, fumes and odors and (b) if the hypothetical person has GAF scores which sometimes drop down into the range of 41 to 50, in my experience such a person would not be able to maintain employment.

Id.

D. The ALJ's Decision

A claimant is not entitled to SSI benefits unless she is "disabled" within the meaning of the Social Security Act, which defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

The first inquiry in the five step evaluation process is whether the claimant is "engaged in substantial gainful work activity." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. See

id. In this case, the ALJ found that Prescott had not engaged in substantial gainful activity since December 20, 2007. R. at 16. Accordingly, he proceeded to the second step in the sequential analysis.

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If not, the claimant is deemed not to be disabled and the application for benefits is denied. See Seavey, 276 F.3d at 5. Here, the ALJ found that Prescott had several severe impairments; specifically, diabetes mellitus wit neuropathy in the bilateral and upper and lower extremities; asthma; obesity; depression; anxiety; and migraine headaches. R. at 16–17. Because the ALJ determined that Prescott had impairments that were severe, he proceeded to step three in the regulatory analysis.

The third inquiry is whether the claimant has an impairment equivalent to a specific list of impairments contained in Appendix 1 of the Social Security regulations. See Seavey, 276 F.3d at 5; 20 C.F.R. § 416.920(d). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement, the claimant is disabled. 20 C.F.R. §§ 404.1509, 416.909. If it is not, the analysis proceeds to the next step. At this step, the ALJ concluded that Prescott's impairments did not meet the severity of one of the listed impairments. R at 18–19. Therefore, his analysis continued to the fourth step.

The fourth inquiry in the five-step evaluation process asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work." Seavey, 276 F.3d at 5. Thus, in order to answer this question, the ALJ must first determine the claimant's RFC. In the instant case, the ALJ concluded:

> [C]laimant has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except that she could only stand or walk for

about four hours in an eight-hour workday. The claimant could occasionally climb stairs or ramps, but she could never climb ladders, ropes, or scaffolds. The claimant could occasionally balance, stoop, kneel, crouch, or crawl. The claimant should avoid concentrated exposure to unprotected heights or humidity. The claimant should avoid even moderate exposure to pulmonary irritants such as dusts, fumes, odors, gases, or areas of poor ventilation. The claimant could relate to supervisors and coworkers on a superficial basis. The claimant could perform three-to-four step tasks. The claimant could sustain concentration, persistence, and pace in the performance of these tasks for two-hour increments over an eight-hour workday and a forty-hour workweek. The claimant could tolerate minor changes in the workplace.

R. at 19.

After explaining the basis for his RFC determination, the ALJ concluded that Prescott was unable to perform her past relevant work. R. at 28. Consequently, he reached the fifth and final step in the disability analysis. The fifth inquiry is whether, given the claimant's RFC, education, work experience and age, the claimant is capable of performing other work. See Seavey, 276 F.3d at 5; 20 C.F.R. § 416.920(g). If so, the claimant is not disabled. 20 C.F.R. § 416.920(g). At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5. In this case, the ALJ relied on the testimony of Loria, the VE, to conclude that Prescott was capable of performing work that exists in significant numbers in the national economy. Therefore, the ALJ found that Prescott was not disabled under the Social Security Act.

ANALYSIS

A.  Standard of Review

The Court's jurisdiction is limited to reviewing the Administrative Record to determine whether the ALJ applied the proper legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam). Substantial evidence is such relevant

evidence as a reasonable mind, reviewing the evidence in the record as a whole, could accept as adequate to support a conclusion. Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Determinations of credibility and the resolution of conflicts in the evidence are for the Commissioner and not for the doctors or for courts. Id.; see Richardson v. Perales, 402 U.S. 389, 399 (1971).

Nevertheless, administrative findings of fact are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). If the Court finds that the Commissioner's decision is based on legal error or is not supported by substantial evidence, it has the power to modify or reverse the Commissioner's decision, with or without remanding for rehearing. 42 U.S.C. § 405(g).

B. ALJ's RFC Finding

Pursuant to 20 C.F.R. §§ 404.1520(e) and 416.920(e), the ALJ must determine a claimant's RFC, which is a claimant's ability to do physical and mental work on a sustained basis despite limitations from her impairments. As the ALJ recognized, in making the RFC finding, he must consider "all of the claimant's impairments, including impairments that are not severe." R. at 15; see 20 CFR 404.1520(e), 404.1545, 416.945; SSR 96-8p. The ALJ formulated Prescott's RFC as follows:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she could only stand or walk for about four hours in an eight-hour workday. The claimant could occasionally climb stairs or ramps, but she could never climb ladders, ropes, or scaffolds. The claimant could occasionally balance, stoop, kneel, crouch, or crawl. The claimant should avoid concentrated exposure to unprotected heights or humidity. The claimant should avoid even moderate exposure to pulmonary irritants such as dusts, fumes, odors, gases, or areas of poor ventilation. The claimant could relate to supervisors and coworkers on a superficial basis. The claimant could perform three-to-four step tasks. The claimant could sustain concentration, persistence, and pace in the

performance of these tasks for two-hour increments over an eight-hour workday and a forty-hour workweek. The claimant could tolerate minor changes in the workplace.

R. at 19.

Prescott argues the RFC was flawed because the ALJ "had no medical basis for his physical RFC, instead relying solely upon his own lay assessment of the medical evidence to determine the nature and extent of Ms. Prescott's limitations." Doc. No. 16 at 6. Prescott argues that the ALJ's findings are inconsistent and therefore invalid. The ALJ stated that he "gave 'some' weight to the opinion of Dr. Fogel, 'minimal' weight to the state DES finding that Ms. Prescott was disabled and 'minimal' weight to the opinion of Dr. Williams, a treating physician, whose physical RFC assessment contradicts the ALJ's RFC finding" and "great weight to the opinion of Dr. Coka, a state agency non-examining physician, whose assessment of Plaintiff's physical limitations he adopted in his RFC finding."

An ALJ must "always consider the medical opinions in [the] case record." 20 C.F.R. § 404.1527(b). Under the "treating source rule," the ALJ should generally give "more weight" to the opinions of "treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). "Generally, a treating source's opinion on the nature or severity of impairments is given controlling weight if well-supported by medically acceptable clinical techniques and consistent with other substantial evidence in the record." McNelley v. Colvin, No. 15-1871, 2016 U.S. App. LEXIS 10155 (1st Cir. April 28, 2016) (citing 20 C.F.R. § 404.1527(c)(2)). The Social Security Regulations provide that:

> if [the ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see SSR 96-2p, 1996. Conversely, the ALJ may discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians. Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4); see also SSR 96-2p, 1996 WL 374188, at *2.

When an ALJ finds that no treating source opinion is entitled to controlling weight, the regulations provide that the weight of all non-controlling opinions by treating, examining, and non-examining medical sources should be evaluated based on the following factors: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). In addition, the ALJ should consider any other factors that tend to support or contradict the opinion that were brought to his or her attention. 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). However, an ALJ is not required to address each of the factors provided in § 404.1527(c)(2). McNelley at *4. The ALJ need only provide "good reason" for giving a treating physician's opinion minimal weight. Id.

"It is well established in this circuit that an ALJ may accord substantial weight to the opinions of non-treating medical reviewers." D.A. v. Colvin, Civ. A. No. 11-40216, 2013 WL 5513952, at *7 (D. Mass. Sept. 30, 2013) (citing Quintana v. Comm'r of Soc. Sec'y, 100 Fed. App'x 142, 144 (1st Cir 2004)). "An ALJ can assign more weight to non-examining medical

reviewers even where these opinions contradict the opinion of treating physicians." Id. (citing Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)). "[I]f the hearing officer comes to a conclusion contrary to that of the treating physician and alternatively adopts the opinion of a non-examining source, then this court must uphold his decision as long as a 'reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.'" Monroe v. Barnhart, 471 F. Supp. 2d 203, 211 (D. Mass. 2007) (quoting Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

Prescott asserts that the ALJ erred in adopting the limitations set forth by Dr. Coka because Dr. Coka found only Prescott's obesity to be severe while the ALJ found that Prescott's "diabetes mellitus with neuropathy in the bilateral upper and lower extremities; asthma; obesity' depression; anxiety; and migraine headaches" were severe impairments.[2] R. at 16. As the ALJ notes in his opinion, "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." R. at 15. In contrast, "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." Id.

Dr. Coka found that Prescott's obesity and affective disorders were severe while her DDD (disorders of the back, discogenic and degenerative) and diabetes mellitus were non severe. R. at 184–85. However, the ALJ's limitations do not mirror Dr. Coka's assessment as Prescott

---

[2] Prescott asserts that the ALJ "made no finding regarding the severity of her lumbar disc disease with radiculopathy or her blurred vision although he mentioned both problems in the decision." Doc. No. 16 at 5. By considering those conditions but not listing them as "severe" in his RFC finding, the ALJ necessarily found both conditions to be nonsevere. To the extent Prescott asserts that this was in some way error, the Court disagrees.

claims. The ALJ found greater limitations than Dr. Coka suggested. Compare R. at 186–87 (Dr. Coka's report suggesting Prescott could climb ramps and stairs frequently, ladders, ropes, and scaffolds occasionally, balancing, stooping, and kneeling unlimited, and crouching and crawling frequently), with R. at 19 (ALJ's determination that Prescott could climb ramps and stairs occasionally, ladders, ropes, and scaffolds never, balancing, stooping, kneeling, crouching, and crawling occasionally). The opinions differ in other respects as well. Compare, e.g., R. at 186 (Dr. Coka's report opining that Prescott could stand and/or walk with normal break for six hours of an eight-hour work day), with R. at 19 (ALJ's determination that Prescott could stand and/or walk with normal break for four hours of an eight-hour work day).

"[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record." Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). But that does not mean "that the Secretary is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the Secretary does not overstep the bounds of a lay person's competence and render a medical judgment." Id. Additionally, "an ALJ is simply not at liberty to substitute his own impression of an individual's health for uncontroverted medical opinion." Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991) (per curiam) (quoting Carrillo Marin v. Sec'y of Health & Human Servs., 758 F.3d 14, 16 (1st Cir. 1985) (per curiam)). The Court does not view the ALJ's determination of Prescott's limitations as running afoul of this rule. Rather, the ALJ weighed the various medical opinions and determined a set of limitations from them. He is not required to adopt one medical opinion wholesale.

Prescott takes particular issue with the ALJ's failure to include any handling limitations. The ALJ stated that "The claimant has also experienced some degree of limitation due to neuropathic symptoms in her bilateral upper and lower extremities, but she recently declined compression stocking or updated EMG studies, suggesting that perhaps her neuropathic issues are not as severe as alleged." R. at 24. There were medical opinions in the record stating that Prescott had no manipulative limitations. See, e.g., R. at 187 (Dr. Coka); R. at 554 (Dr. Fogel's opinion that Prescott's diabetes "does not present any significant functional limitation to normal daily life and work activities"). This was not a case of the ALJ interpreting bare medical evidence; rather, he considered the opinions of the various doctors that were in the record.

Under these circumstances, the Court finds that the ALJ's RFC finding was supported by substantial evidence.

C. ALJ's Step Five Finding

At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5. "The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis." Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011). If, however, the hypothetical posited "lack[s] record support," then his opinion is not "substantial evidence." Garay v. Sec'y of Health & Human Servs., No. 94-1515, 1995 WL 54077, at *1 (1st Cir. Feb. 10, 1995) (finding that ALJ erred by failing to include "mild to moderate" mental disorder in hypothetical presented to VE). That is, "the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Secretary of Health and Human Services, 670 F.2d 374, 375 (1st Cir. 1982). "To guarantee that correspondence, the Administrative Law Judge must both clarify

the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." Id. "To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC finding that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments." Cook v. Colvin, No. 2:13-CV-30155, 2015 U.S. Dist. LEXIS 11853 (S.D. W.Va. Jan. 5, 2015) (citing Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." Fisher v. Barnhart, 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical is generally "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." Id. (quotation marks omitted).

The ALJ posited the following hypothetical to Loria which mirrored the RFC:

Q: Assume if you will that a second hypothetical person had the following limitations: This person would be able to lift and carry 20 pounds occasionally and 10 pounds on a frequent basis; this person would be able to sit for six hours out of an eight-hour workday; stand and/or walk for four hours out of an eight-hour workday; this person would occasionally be able to climb stairs and ramps, never ropes, ladders, and scaffolds; would occasionally be able to balance, stoop, crouch, kneel, and crawl; this person would have to avoid concentrated exposure to unprotected heights and humidity; avoid moderate exposure to pulmonary irritants; this person would be able to relate to co-workers, supervisors, and the public on a superficial basis; and would be able to understand and carry out three to four-step tasks; and would be able to maintain concentration, persistence, and pace in the performance of those tasks for two-hour increments over an eight-hour workday over a 40-hour workweek; would be able to deal with only minor changes in the workplace. Would such a person be able to perform any work in the regional or national economy?

A: Yes. That would restrict several of the light jobs although it would not preclude all light jobs. So I would offer a number of sedentary jobs. There would be certainly at the sedentary, unskilled level, DOT 734.687-018, sedentary, unskilled. Massachusetts would yield about 2,300; nationally there would be about 125,000. Quality control workers, DOT 726.684-110. Massachusetts has about 2,000; nationally about 95,000. And then there would be a number of press machine tenders at the sedentary level, DOT 689.585-018. Massachusetts would have about 650; and nationally there would be approximately 30,000.

R. at 96–97. The ALJ's hypothetical mirrored the RFC and his RFC finding was supported by substantial evidence. Accordingly, the hypothetical posited to the VE was proper.

Prescott next challenges whether the jobs the VE described actually exist in the economy and states that it was inappropriate for the ALJ not to consider the Meuse affidavit that contradicted Loria's testimony. The ALJ notes that he made his findings "[a]fter careful consideration of the entire record." R. at 16. Additionally, Meuse's affidavit was not uncontradicted as Prescott claims; rather, Meuse's affidavit and Loria's testimony directly contradicted each other. "An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." NLRB v. Beverly Enters. Mass., 174 F.3d 13, 26 (1st Cir. 1999). By adopting Loria's view, the ALJ implicitly rejected Meuse's opinion in his affidavit. See id. The ALJ made no error in doing so.

## CONCLUSION

For the reasons stated, this Court DENIES Prescott's Motion to Reverse, Doc. No. 16, and ALLOWS the Defendant's Motion to Affirm, Doc. No. 22.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge